O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ANL SINGAPORE PTE LTD, | ) | Case No. CV 18-08631 DDP (JEMx) |
| Plaintiff, | ) | |
| v. | ) | **ORDER RE: MOTIONS FOR SUMMARY JUDGMENT** |
| PRIME SHIPPING INTERNATIONAL, INC., ET AL., | ) | |
| | ) | [Dkts. 33, 40] |
| Defendants. | ) | |

Presently before the court are the parties' cross-motions for summary judgment. Having considered the submissions of the parties and heard oral argument, the court grants Plaintiff's motion for partial summary judgment, grants Defendant's motion in part, denies Defendant's motion in part, and adopts the following Order.

**I. Background**

ANL Singapore PTE Ltd ("Plaintiff" or "ANL"), an ocean freight carrier, brings this action against Prime Shipping International, Inc. ("Defendant" or "Prime"), a U.S. non-vessel-operating common carrier.[1]

---

[1] See 46 C.F.R. § 515.

ANL and Eumex, a Chinese entity, entered into an agreement, in the form of a bill of lading, for the transport of two shipping containers containing $20,000 of plastic food containers from Ningbo, China to Los Angeles, California. (Decl. Bryan Bissonette, ¶ 8; Ex. A.; Decl. Wuquan Shao, ¶ 3.)[2] The bill of lading identifies Eumex as the shipper, Prime as the consignee and notifying party, and ANL as the carrier. (Id. at ¶ 6, Ex. A, Ex. B.) Marine Chaser was the ultimate consignee and cargo owner. (Wuquan Shao Decl. ¶ 5.)

ANL delivered the containers to the Port of Los Angeles at the West Basin Container Terminal ("the terminal") on August 23, 2015. The containers were subject to U.S. Customs ("Customs") examination. (Decl. Bissonette, ¶ 10.) Plaintiff alleges, and Defendant does not appear to dispute, that once the containers cleared Customs, Defendant was to remove the containers from the terminal and transport the containers to the ultimate consignee, Marine Chaser. (Compl., ¶ 19.). Customs, however, never cleared the two shipping containers, which remained at the terminal.[3] (Decl. Morrow, ¶ 4 ; Ex. 4E at 35:1-2.)

Generally, when uncleared cargo remains at the terminal, "the master or owner of the vessel or the agent thereof" must notify Customs of the delay within twenty days of landing. 19 C.F.R. §

---

[2] Plaintiff filed the Declaration of Brian Bissonette and the exhibits thereto as the Declaration of Bryan Boyce. (Dkt. 33-6.)

[3] The bill of lading states that the first four days following the container's arrival at the port are "free days" without imposition of demurrage, or late fees. (Decl. Bissonette, Ex. C. ; Decl. Morrow, Ex. 4C. ; Compl., Ex. F.) The term "demurrage" applies to fees imposed by the carrier as well as by the port for the use of terminal space. (Decl. Bissonette, ¶ 13. ; Compl., Ex. F.)

2

4.37(a). The carrier must also disclose the continued presence of the uncleared cargo to a "bonded warehouse . . . qualified to receive general order merchandise." 19 C.F.R. § 4.37 (c). The bonded warehouse then removes and stores the cargo, at the expense of the consignee. Id.

Here, it is undisputed that ANL did not notify a general order warehouse of the continued presence of the two uncleared containers at the terminal within the regulatory period. The containers began to accumulate demurrage, or late fee, charges from both ANL and the terminal.

Approximately three months later, on December 8, 2015, Defendant sent an e-mail to Plaintiff asking Plaintiff to move the containers to a general order warehouse as soon as possible. (Morrow Decl., ¶ 2, Ex. 2A.) A flurry of e-mails followed. Plaintiff responded that Customs had placed the cargo on a "constructive [general order]." (Morrow Decl., ¶ 2, Ex. 2B.) That same day, Prime asked why Customs had taken such action, and indicated that Prime's customer "might not want the cargo any more since there is so much demurrage at the terminal." (Morrow Decl. ¶ 2, Ex. 2C.) Plaintiff responded that it did not know why Customs had so acted. (Id.)

The next day, Prime sent Plaintiff a message observing that demurrage fees now exceeded $90,000, and asking that ANL "charge [Prime] only the value of two new containers for extending using [sic] based on the situation that no one wants the cargo . . . . Hope to avoid paying for equipment demurrage by doing so." (Morrow Decl., Ex. 2D.) ANL responded by asking Prime to "push your customer" and indicating that in the event of abandonment, Prime

3

would be liable for demurrage and general order costs. (Morrow Decl. Ex. 2E.)

A week later, Prime indicated that its customer only wanted the cargo on the condition that all charges, including demurrage, would not exceed the cargo's $20,000 value. (Morrow Decl. Ex. 2F.) Plaintiff responded that ANL would waive its "line demurrage" and had arranged for "mitigated" terminal demurrage charges of approximately $6,000. (Morrow Decl. Ex. 2G). It appears, however, that nothing came of this exchange, and that the containers continued to sit at the terminal.

Approximately two months later, on February 5, 2016, ANL received a letter from Eumex, the Chinese shipper, indicating that Eumex was abandoning the cargo. (Morrow Decl., Ex. 2H.) Prime also sent an e-mail to ANL indicating that Prime "got overseas confirmation to abandon this cargo now." (Morrow Decl., Ex. 2H.) On February 11, Prime asked ANL whether ANL "need[ed] anything else from [Prime], to which ANL responded, "No, nothing else." (Morrow Decl., Ex. 2I.)

There was no further contact between the parties until June 10, 2016, when Plaintiff indicated to Prime that the containers were still accumulating demurrage and that ANL could not find a buyer for the containers. (Decl. Morrow, Ex. 2J. ; Ex. H at 48:17-49:13.) On June 15, 2016, Defendant wrote a letter to Plaintiff declaring that "we have abandoned the ownership of above mentioned cargo." Decl. Bissonette, Ex. D.) ANL then, on June 24, moved the two containers to a general order warehouse. (Decl. Morrow, Ex. 2L.)

Three days later, ANL sent Prime an e-mail referencing an unpaid bill that included approximately $52,000 in terminal storage fees, but did not include any charges for line demurrage. (Morrow Decl., Ex. 2K.) In response to the bill, Prime indicated that it would not be responsible for any charges because, according to Prime, ANL "[confirmed] with us last year and there is no charges [sic] on this container if we abandon it . . . . The cargo has been abandoned . . . ." (Morrow Decl. Ex. 2L.) ANL replied that the "demurrage/storage" charges were due through June 24, the date that the cargo was finally moved to a general order warehouse, but that "there will be no further demurrage on our end." (Id.)

Prime then reiterated that it "confirmed cargo abandoned long ago." (Morrow Decl., Ex. 2M.) In response, ANL stated that it had advised Prime that Prime would be responsible for charges if the cargo was abandoned, and pointed out that Prime had not picked up the cargo even though ANL had waived its own demurrage charges and "mitigated" terminal charges. ANL further clarified that the charges at issue by that point, in June 2016, consisted of terminal demurrage, not ANL's line demurrage, which ANL continued to waive. (Id.) ANL sent Prime an invoice for $56,294.93 on October 20, 2016. (Morrow Decl., Ex. 2O.)

On November 17, 2016, Prime notified ANL that Eumex would work out payment with ANL. (Morrow Decl., Ex. 2P.) In January 2017, Prime reiterated that ANL should sort out any payment issues with Eumex. (Morrow Decl., Ex. 2T.) Approximately six months later, on July 21, 2017, ANL sent Prime an invoice for $269,830.00. (Morrow Decl, Ex. 2N.). The parties appear to agree that that amount includes ANL's line demurrage, also known as tariff demurrage. In

other words, Plaintiff's 2017 invoice, unlike Plaintiff's earlier invoices and requests for payment, did not waive line demurrage.

ANL's Complaint in the instant action seeks to recover the $269,830.00 amount, plus an additional $4,162.81 for transportation and auction costs. The Complaint alleges causes of action for breach of contract, account stated, quantum meruit, book account, and services rendered.

ANL and Prime each now move for partial summary judgment. Prime seeks summary judgment on ANL's claims insofar as they relate to Prime's line demurrage. Prime further seeks partial summary judgment on the quantum meruit and services rendered claims, arguing that Prime never received anything from ANL. ANL seeks summary judgment solely on the question whether Prime is liable to ANL under the bill of lading.

**II. Legal Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is

entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel have an obligation to lay out their support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

**III. Discussion**

    A. ANL's Motion for Summary Judgment

Although not entirely clear, ANL's motion appears to seek only a determination that the bill of lading is "the contractual basis of ANL's claim against Prime." (ANL Mot. at 2:16-17.) Insofar as the partial judgment sought is so limited, Defendant does not appear to oppose the substance of ANL's motion. Although Defendant Prime has filed an opposition to ANL's motion, that opposition consists of largely of (1) a recitation of the facts and (2) a restatement of the arguments made in Prime's own motion as to why ANL is not entitled to certain categories of damages and why ANL's third and fifth causes of action fail. Nowhere does Prime dispute ANL's core assertion that the bill of lading sets forth the obligations of the parties. Indeed, Prime takes exception to ANL's omission of ANL's tariff from the motion, and goes on to suggest that both the tariff and the bill of lading must be read as a single document comprising the contract between the parties.[4] (Prime Opp. at 8:21-9:5.) Prime's own motion similarly states that ANL's breach of contract claim is based upon "the ANL bill of lading and ANL's tariff." (Prime Mot. at 11:22-23.) Furthermore, Prime's arguments quote from and depend upon the very language of that contract. (Prime Mot. at 16:10-18.) The court therefore concludes, and the parties apparently agree, that the parties' respective liabilities are set forth in the bill of lading and associated ANL tariff.

B. Prime's Motion

---

[4] ANL does not suggest otherwise. ANL refers to its tariff in the Complaint as well, and attaches the tariff to the Complaint as an exhibit. The bill of lading also refers to and incorporates the tariff. Complaint, Exs. B, F.

Prime's Motion for Summary Judgment seeks a determination that (1) ANL is not entitled to any tariff, or line, demurrage and (2) that ANL's quantum meruit and services rendered claims fail because Prime received no benefit from work or services performed by ANL.

### 1. Tariff Demurrage

#### a. Equitable Estoppel

Prime argues that ANL should be equitably estopped from seeking any tariff demurrage. Under the doctrine of equitable estoppel, a party cannot assert a fact if he has intentionally lead another party to believe and rely upon a contrary fact. See People v. Castillo, 49 Cal. 4th 145, 156 n.10 (2010). "The elements of equitable estoppel are (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." Schafer v. City of Los Angeles, 237 Cal. App. 4th 1250, 1261 (2015) (internal quotation marks omitted).

Here, Prime argues that ANL is equitably estopped from asserting a claim to tariff demurrage because it represented to Prime that all line, or tariff, demurrage would be waived. ANL did, on December 17, 2015, state that it was "waiving our line demurrage." (Morrow Decl., Ex. 2G.) That statement was not made in a vacuum, however. ANL waived its line demurrage in response to Prime's request that ANL help reduce the total charges, including demurrage, down below the value of the goods. By so doing, and by "mitigating" terminal demurral charges, ANL was able to reduce applicable expenses to approximately $6,000 "assuming [the cargo

was retrieved] in the next few days."[5] (Morrow Decl., Ex. 2G.) ANL's message cannot reasonably be read, however, to suggest that ANL was agreeing, or misleading Prime to believe that ANL was agreeing, to waive all tariff demurrage for all time, regardless whether the cargo ever cleared Customs or Prime ever retrieved the cargo. Rather, by waiving its own line demurrage and mitigating the port demurrage as of December 2015, ANL was simply acceding to Prime's request that ANL find a way to reduce demurrage charges to less than $20,000.

The question whether ANL led Prime to believe that line demurrage fees would be waived in perpetuity is somewhat more complicated after December 2015. In February 2016, after receiving notice of abandonment from Eumex, ANL told Prime that ANL required nothing further from Prime. In June 2016, when explaining that the cargo had finally been moved to a general order warehouse, ANL indicated that the charges to date totaled approximately $56,000, comprised mostly of approximately $52,000 in terminal storage fees. (Morrow Decl., Ex. 2K.) ANL's message made no mention of tariff demurrage charges, and explicitly stated that the demurrage fees at issue were terminal demurrage fees, not line demurrage. Similarly, in October 2016, ANL issued Prime an invoice for $52,132.12. (Morrow Decl. Ex. 2O). This amount represented only terminal demurrage, not ANL's line/tariff demurrage. These communications demonstrate that, as of October 2016, Prime reasonably understood that ANL was continuing to waive its own tariff demurrage charges.

---

[5] At the same time it apprised Prime of that reduction, ANL reiterated that the cargo had still not been cleared by Customs and that ANL could not release the cargo until it had received payment. (Morrow Decl., Ex. 2G.)

10

Notably, however, there is no indication that, at least as of October 2016, ANL had any different understanding of the facts. In other words, there is no evidence in the record that, prior to the 2017 invoice, ANL attempted to mislead Prime into believing that line demurrage would be waived ad infinitum as part of some undisclosed scheme to induce Prime to continue to rack up massive hidden tariff demurrage fees. ANL's initial 2015 offer to waive tariff demurrage was responsive to Prime's request to minimize total charges, and appeared to further the parties' common goal of avoiding abandonment of the cargo and removing it from the terminal as soon as possible. The October 2016 invoice reflects that same understanding.[6] It is clear from the invoice that, had Prime paid the terminal demurrage fees in October 2016, ANL would not ever have charged any tariff demurrage fees. That continued accommodation, however, cannot fairly be read as a misrepresentation that ANL had waived line demurrage until the end of time, regardless whether Prime ever paid even the terminal demurrage. Prime has presented no evidence that ANL's offers to waive line demurrage were not made in good faith at the time they were made or that ANL intended to trick Prime into believing that

---

[6] Indeed, ANL's October demand for payment is inconsistent with the assertion that ANL intended to induce Prime <u>not</u> to pay as a means of tricking Prime into incurring more, as-yet uncharged tariff fees.

11

the waiver of ANL's line demurrage was unconditional.[7] Prime's equitable estoppel argument therefore fails.

### b. ANL's Tariff

Prime further contends that the terms of ANL's own tariff forbid ANL from charging demurrage under the circumstances here. ANL's tariff states, "When the carrier is for any reason unable to tender cargo for delivery during free time, free time will be extended for a period equal to the duration of the carrier's inability to tender the cargo. If such condition arises after the expiration of free time, no demurrage . . . will be charged for a period equal to the duration of the carrier's inability to tender the cargo." (Complaint, Ex. F.). ANL's person most knowledgeable testified that Prime had no ability, independent of the ultimate consignee, Marine Chaser, to clear the cargo through Customs. (Morrow Decl., Ex. 4F.) Prime's designee also acknowledged that, absent Customs clearance, Prime could not have picked up the cargo. (Id.) Prime argues, therefore, that ANL never tendered the cargo for delivery and, therefore, could not charge tariff demurrage.

Other language in the tariff and bill of lading, however, arguably conflicts with the tariff provision cited by Prime. Paragraph 19(4) of the bill of lading states that the carrier's obligations are completely discharged if goods are delivered to or taken into the custody of Customs or other government officials. (Complaint, Ex. B.) The tariff further states, "The carrier shall

---

[7] Nor can ANL's statement in June 2016 that "there will be no further demurrage on our end" reasonably be read to suggest that ANL would never, under any circumstances, charge line demurrage. Read in context, the statement explains that no further tariff demurrage would be assessed after June 24 because, as of that date, the cargo had been moved to a bonded warehouse.

12

not be responsible for delays in delivering containers when such delays result from cargo being detained in customs or quarantine. Any demurrage charges that are accrued resulting from delays in customs and/or quarantine are to be billed for account of the cargo." (Complaint, Ex. F.)

Although Prime attempts to characterize these conflicting terms as creating an ambiguity in the contract, Prime's argument is not convincing. Prime equates its inability to retrieve the cargo, which resulted from customs issues, as equivalent to ANL's failure to tender the cargo. The bill of lading, however, clearly states that ANL's obligations cease once the cargo is delivered into Customs' custody. Prime's interpretation would render paragraph 19(4) of the bill of lading, and portions of the "Demurrage" section of the tariff, meaningless.[8] The tariff therefore does not bar Plaintiff from recovering line demurrage.

                              c.    ANL's Failure to Mitigate

Lastly, Prime argues that ANL failed to mitigate its damages by moving the containers to a bonded warehouse, as it was required to do by law. Customs regulations require that carriers notify both Customs and a bonded warehouse of any cargo that has not cleared customs within 20 days of landing. 19 C.F.R. § 4.37(a),(c). The warehouse is then responsible for removing the goods. 19 C.F.R. § 4.37(c). It is undisputed that ANL did not provide a bonded warehouse with the requisite notice until June 2016, approximately ten months after landing the cargo.

---

[8] In other words, the fact that Prime was not able to retrieve the cargo unless and until Customs cleared the cargo does not mean that ANL failed or was unable to tender the cargo.

13

ANL claims, without any citation to the record, that Prime was "fully aware that Plaintiff had nothing to do with the constructive [general order] ordered by [Customs.]"[9] (Opp. to Prime MSJ at 7:2-3.) The correspondence between the parties does indicate that ANL notified Prime in December that the cargo had been placed "on a constructive G.O." (Morrow Decl. Ex.2 B.) The parties' initial briefing, however, cited to no evidence as to when or why Customs placed the cargo in constructive general order status, what role, if any, ANL played in that decision, or what, if any, action ANL took or could have taken subsequent to Customs' decision. Accordingly, this Court ordered the parties to file supplemental briefs addressing why the cargo was placed under a constructive general order; whether, when, and how the parties became aware of that designation; and what, if anything, the parties could have done once the cargo was so designated. (Dkt. 51.)

The supplemental briefing casts little light upon these questions. Plaintiff provides an exhibit indicating, for the first time, that Customs issued the constructive general order notice to Plaintiff on September 15, 2015. (Plaintiff's Supplemental Brief, Ex. G). There is no indication, however, that Plaintiff notified Prime, or that Prime was otherwise aware, of the constructive general order designation prior to December 2015. Furthermore, Plaintiff's exhibits provide no insight as to why Customs determined that the plastic containers in question "require[d]

---

[9] Plaintiff's supplemental brief more explicitly, albeit without elaboration or explanation, contends that "[t]he Constructive G.O. constrained Plaintiff after the time when it would normally be freed of its responsibility as to the cargo . . . ." (Plaintiff's Supplemental Brief at 6:5-6.)

14

specialized storage" typically reserved for dangerous cargo such as hazardous materials, firearms, and ammunition; a determination generally precipitated by a carrier's initial notification of the presence of dangerous cargo. (Prime Request for Judicial Notice, Attachment 3.) Although a bonded warehouse's inability to accept dangerous cargo can result in the issuance of a constructive general order notice, it is undisputed that Plaintiff never contacted a warehouse prior to June 2016, and, accordingly, there is no evidence that any warehouse refused to accept the cargo. See 19 C.F.R. § 4.37(e). It is, therefore, far from clear that Plaintiff had "nothing to do" with the constructive general order notice.

Much of Plaintiff's supplemental brief focuses on the argument that Prime's agreement with Marine Chaser, the ultimate consignee, allowed Prime to abandon or pick up the cargo even without Marine Chaser's cooperation. As an initial matter, this argument conflicts with evidence, including testimony from Plaintiff's own designee, that Prime had no ability to clear the cargo through Customs independent of Marine Chaser. (Morrow Decl., Ex. 4F.) Furthermore, this argument fails to address what options remained available to Plaintiff or why the constructive general order notice limited Plaintiff's ability to mitigate its own damages.[10] On June 24, 2016, Plaintiff ultimately did have the cargo removed to a bonded warehouse. Plaintiff has provided no explanation as to why it could not have done so sooner, either within the regulatory period or at any point prior to June 2016.

---

[10] See note 9, above.

15

ANL had a duty to take reasonable steps to mitigate its damages. Yang Ming Marine Transp. Corp. v. Okamoto Freighters Ltd., 259 F.3d 1086, 1095 (9th Cir. 2001). It is undisputed that ANL did not provide a bonded warehouse with notice within the 20-day period prescribed by regulation. It is also undisputed that, had ANL done so, the cargo would have been moved to a warehouse and ANL would not have incurred any further storage or demurrage expenses.[11] ANL would then have had no right or occasion to charge Prime any further line demurrage, as any subsequent storage disputes would have been issues for Prime to resolve with the warehouse, not with ANL. As a result of ANL's failure to comply with regulatory requirements and concomitant failure to mitigate its damages, ANL is barred from recovering tariff demurrage after September 12, 2015, the date by which it should have notified a bonded warehouse of the uncleared cargo.

2. Common Counts

Prime argues that it is entitled to summary judgment on ANL's third cause of action for quantum meruit and fifth cause of action for services rendered because there is no allegation, let alone evidence, that Prime received any benefit from ANL.[12] A plaintiff cannot recover on a quantum meruit theory unless he shows that he acted pursuant to a request for services, express or implied, and

---

[11] In Yang Ming, the court found that although a carrier might be required to make "reasonable" expenditures in order to mitigate its damages, it could not be not required to make "substantial" or "extraordinary" expenditures. Yang Ming, 259 F.3d at 1086. Here, there is no evidence that Plaintiff would have incurred or did incur any substantial expense by having the cargo moved to a bonded warehouse.

[12] Although alleged as two separate causes of action, Plaintiff makes no attempt to distinguish the two.

16

that those services were intended to, and did, benefit the defendant. <u>Ochs v. PacifiCare of California</u>, 115 Cal. App. 4th 782, 794 (2004). Plaintiff's argument that "an analysis of Defendant's liability may well, in some degree or kind, focus on the reasonable value of plaintiff's services" is difficult to parse. Plaintiff refers to "international freight services" and "services provided by plaintiff in attempting to administer the problems caused by the failures of Defendant," but cites to no evidence that any of those services did, or were intended to, benefit Prime. Furthermore, plaintiffs cannot bring equitable quantum meruit claims where, as here, the parties have an "actual contract covering a subject." <u>DPR Constr. v. Shire Regenerative Med., Inc.</u>, 204 F. Supp. 3d 1118, 1131 (S.D. Cal. 2016) (citation omitted). Plaintiff's assertion that "the quantum meruit and account stated are useful tools in the trial process, and since there is no prejudice to the Defendant, should remain," provides no basis for denial of Prime's motion with respect to the third and fifth causes of action.

**IV. Conclusion**

For the reasons stated above, ANL's Motion for Summary Judgment is GRANTED, to the extent it seeks a determination that the bill of lading and other incorporated documents set forth the obligations of the parties. Prime's Motion is GRANTED in part and DENIED in part. The motion is denied insofar as Prime seeks to prevent ANL from seeking tariff demurrage on estoppel or tariff grounds. The motion is granted, however, insofar as it seeks to limit ANL to tariff demurrage that accrued prior to September 12,

2015. Summary judgment is also granted to Prime with respect to Plaintiff's third and fifth causes of action.


IT IS SO ORDERED.

Dated: August 15, 2019

                                        DEAN D. PREGERSON
                                        United States District Judge